Court being founded in 1744, People references Darien and Harry. Counsel, please approach. State your name and approximately how much time. David Berger, I'm the Office of the State Appellate Defender on behalf of Darien Harris. Approximately 20 minutes, Your Honor, and if I may reserve some time for rebuttal. Good morning, Justices. I'm Eric Leibland, Assistant State's Attorney. Good morning, Your Honors, and may it please the Court. I'd like to focus today on two of the four issues that were raised on behalf of Darien Harris in his opening brief, namely Issue 1 pertaining to the sufficiency of the evidence for the first-degree murder conviction and Issue 3 pertaining to the constitutional infirmities in his sentence. Issue 1, the evidence at trial was not sufficient to prove that Darien shot and killed the decedent, Rondell Moore. There are various reasons why this is so. First, there's only one reasonable inference that can be drawn from the evidence. Rondell was shot in the parking lot of the Chase Bank, a block south of the BP gas station where Darien was identified. Two, the ballistics indicates that there was a second shooter in the bank parking lot. Rondell was shot with a .22 caliber bullet, whereas the gun that was discharged at the gas station where Darien was identified was a .380 caliber. And furthermore, there is no evidence at all that Darien was ever in the parking lot of that Chase Bank, whereas there was evidence that several other individuals were, most notably the state's witness, Aaron Jones. And it bears emphasis that the trial judge in this case didn't believe for a minute that Aaron was not involved in the murder of Rondell. The police didn't believe it either. He was arrested, Aaron was arrested, was the principal suspect in this case, and was released only after he gave up Darien. So let me elaborate on each of these points in turn. First, we know that Rondell was not shot at the gas station, but rather at the Chase Bank a block away after he fled the gas station when the shooting began there. The occurrence witnesses who identified Darien at the gas station did not see Rondell get shot there. They saw Quincy Woolard get shot and fall down. They saw Rondell turn, run, climb a fence that we don't know the exact height of it, but state's exhibits 9th and 12th pick the fence. It's several feet high, it's up here, it's not a low fence down on the ground. I thought there was some testimony about spaces in the fence? Pardon? There were some spaces in the fence that he could have run through? I don't recall any testimony about spaces in the fence, no. And there don't appear to be any spaces in the chain link fence that are depicted in the state's exhibits. Don't we have the testimony of Mr. Saffold who specifically identified the defendant as shooting Rondell? He did not identify him as shooting Rondell. He identified Darien as somebody who was at the gas station and discharged the firearm. But Mr. Saffold did not testify that he saw Rondell get shot. He did not testify that he saw Rondell act in any way that might indicate that he got shot. For instance, stumbling, screaming in pain, starting to bleed, falling over. He just saw the shooting. He saw somebody open fire. He said he didn't see exactly where he pointed the gun. He just saw shots fired. Not just somebody, your client. He saw your client shooting. He testified that, yes, he testified that he saw Darien shooting. But there's no evidence, in fact the evidence is quite to the contrary, that Rondell was actually shot in that sequence of events. The evidence shows rather that Rondell was shot subsequently in the parking lot of the Chase Bank and not at the gas station. And you made that argument to the trial judge, right? The defense counsel made that argument to the trial judge. Well, the defense counsel argued that there were multiple shooters based on the ballistics evidence, but the defense counsel did not argue specifically that the shooting of Rondell, based on the forensic evidence that we have, would have had to have taken place at the bank. So that's not an argument that the trial judge ever really appreciated in this case. And there are several reasons why we know that this has to be so. Well, but you don't have, looking at your issues here, you don't have an ineffective assistance claim. No, but, well, the defense counsel in this case did try to put forward an argument for the trial judge that there had to be multiple shooters. It doesn't quite nail down exactly the reasons for that. We'd be happy to. Well, but I guess my question is, if the argument wasn't made to the trial judge, how can it be a basis for a sufficiency of the evidence argument on appeal? Well, because the evidence that was presented to the trial judge in this bench trial, the trial judge is presumed to consider all the relevant evidence. It does not show that Rondell was actually shot at the gas station. And that was the State's theory of the case. And so it was the State's burden to produce evidence that actually showed that Rondell was shot at the gas station. But there's no, you know, in a sufficiency of the evidence argument, this Court is reviewing the ultimate conclusion of the trial court. And the conclusion of the trial court is not sustained by the evidence that the State presented. We would be happy to provide a supplemental brief arguing ineffective assistance of counsel. Well, thanks. But really the ultimate issue here is that the evidence doesn't prove that Darian shot Rondell. And here's why we know that. We know from the medical examiner that Rondell was shot in the lung and in the pulmonary arteries, the artery that carries oxygenated blood from the heart to the lung. And yet we would have to believe if Rondell was shot at the gas station that despite those injuries, he managed to run, climb a several foot high fence, go all the way down the block, cross 66th Place into the Chase Bank while he had a bullet in his lung and his lung was filling with blood. And he would have to have done that without leaving any trail of blood anywhere between the gas station and the bank parking lot. What we have in this case is there was some blood found at the gas station. The State did not produce any evidence as to what it was. It could very well have been Quincy Ward's. It was found right near where Quincy was shot and was on the ground bleeding. And then we know from the forensic investigator stipulation that there were some blood samples taken from the Chase lot where Rondell was found. There's no evidence that there's any blood anywhere in between. And so the only rational inference to draw from that is that we have two victims and two pools of blood found where each of the victims was found lying, but there were two separate shootings in those two separate locations. We also know from the ballistics that there was a second gun indicating a second shooter. All of the bullets recovered from the gas station were .380 class caliber, but the bullet recovered from Rondell was a .22. There's no evidence that Darien ever had a second gun. Ronald Moore, the brother of the deceased, testified that he was within feet, four feet or so from Darien at the time of the shooting at the gas station. He only saw one gun. Nobody saw a second gun. So there's really no way to conclude reasonably based on all this that Rondell was shot at the gas station as opposed to at the bank parking lot. And so for the evidence to be sufficient to convict Darien, we would need some evidence tying Darien to the events in the bank parking lot. We don't have that either. But we have testimony, Mr. Stafford, that he saw Harris shooting at the gas station, at the decedent, and at Wofford. Well, Mr. Saffold testified that he saw Darien discharge a firearm. He said he didn't see where Darien pointed the firearm. I thought he said he pointed it at those two individuals. He pointed it in the direction of the car where those individuals were standing. And we know from Quincy Ward's testimony, Quincy said he heard three shots fired. And we know that Quincy was shot three times in the back. That's a stipulation of the trauma surgeon. And then he went, he fell down to the ground, and Rondell took off, climbed that fence, and ran down the block. It's not believable that he could have done that with a bullet in his lung and a severed pulmonary artery, much less do that without leaving any blood anywhere between the gas station and the bank parking lot where he's ultimately found. And so that's how we know that there was a second shooting in this case at the bank parking lot. And there's nothing that links Darien to it. There's no eyewitnesses to whatever happened in the bank. There's no physical evidence linking Darien to any gun. There's no inculpatory statement. All we know is that, or what we do know, rather, excuse me, is that while nothing and no witness ever put Darien in the bank parking lot, we do know that other individuals were there, most notably Aaron Jones. We know from Ronald's testimony that Aaron was driving his Lexus through the bank parking lot when Ronald ran after his brother and found him there. We know from Ronald's testimony that there was bad blood between Aaron and at least one of the Moore brothers, namely Ronald. We know that the trial judge didn't believe that Aaron was innocent in this case. We know that the police didn't believe it. We know that Aaron was arrested and was only released after he gave up Darien. We also know from Aaron's testimony that after the shooting, he drove back to his house, went inside for just a few seconds, came right back out and drove to the Walgreens, which is immediately south of the Chase Bank, where he was then stopped and arrested by the police within minutes. I think it was about five minutes or so after the shooting. There was no warrant to search Aaron's house, despite the fact that he was held in custody for two or three days and questioned by the police. So we're not looking for the boogeyman in this case. I mean, we know that that bank parking lot had several other individuals, including Aaron, who were there. Counsel, let me ask you this question. The record is clear that the trial judge found Mr. Saffold to be the most credible witness that testified at the trial. Is there any medical evidence in the record where a doctor testified that it would have been very difficult, if not impossible, for Rondell to move from the gas station parking lot to the bank parking lot? No, there wasn't a testimony from a physician. What we have is a testimony from the medical examiner pertaining to the nature of Rondell's wounds. Now, there's a case. I mean, what we would have to infer is that if there was more than one shooter, because we know that Mr. Harris was a shooter. We have that evidence in the record. Do we have to infer that if Rondell was shot in the chase lot, that all three shots took place in the chase lot? Couldn't he have been shot at the BP station, run to the chase lot, and there he was shot in the lung? Well, there was a bullet recovered from his abdomen, which is a .22, which is not consistent with any of the casings that are found at the gas station. And so you would need evidence. Were all the bullets recovered from his body? No, he had three gunshot wounds. Right. That's my point. There was one that was recovered. But the one that was in his abdomen, the one that was not, the one that was recovered was the .22. Right. So that couldn't have been fired at the gas station because that gun was a .380, and there was no evidence of any second gun. But all these arguments were made to the judge. The trial counsel in this case argued that there must have been a second shooter at the gas station, and the … The judge didn't accept that. He said that he believed Mr. Stafford plus Mr. Jones and Mr. Moore were enough to … Well, as far as the ballistics goes, what the ballistics showed at the gas station, the defense counsel argued that there had to have been two shooters there, but in fact what the ballistics expert said was that you couldn't tell conclusively whether all the casings recovered from the gas station were fired from the same gun or not. We know they were all .380 caliber, but they just … So there was enough there, so the judge, he found, like a Kennedy says, a single shooter here. I mean, that's where the judge comes in. But there couldn't be a single shooter because … Well, there could be, but with that testimony, there's enough in there because it wasn't clear where the other bullets might have come from or whether this bullet could have come from that gun or … Well, it's clear that there's a second gun, and that that gun is used to shoot Rondell. There's … For Rondell to have been shot at the gas station, there would have to be … Nobody … I mean, it bears emphasis … This goes back to Justice Neville's question about the testimony of Dexter Saffold. Neither Dexter nor any other witness ever said, I saw Rondell get shot at the gas station. They said, we saw Rondell run and jump over a fence that's several feet high and run down the block. So we don't have any … We don't have any testimony that anyone saw Rondell get shot at the gas station. We don't have his blood at the gas station. It was blood recovered, but it wasn't tested, so we don't know that it didn't come from Quincy Bullard. We don't … We know that there were at least two guns used in this … In these events, but we don't have any testimony that Darien had two guns. And we know that the gun that was discharged at the gas station was not a .22, which is the bullet … It just … It just sounds to me like you're saying, yeah, he shot, my client shot, but maybe somebody else shot, too. So where does that get you? Well, it … Darien didn't actually cause Rondell's death. That's where it gets us. To be guilty of first-degree murder, he has to be the one who caused Rondell's death. He has to have actually shot Rondell. Which goes back to my question. Why couldn't we assume, even if … Even if the judge had to accept, based on the different caliber bullets, that the fatal shot to Rondell occurred in the Chase parking lot, why couldn't he have been shot by Mr. Harris at the BP station? Well, because, again, we would have to believe that, having been shot in the lung, in the pulmonary artery, he managed to jump that fence, run all the way down the block, and do it without bleeding any blood anywhere. That is really unbelievable. And again, we have the conflicting ballistics evidence. We have the … I'm sorry, the evidence that there are two different guns used. And we don't have any testimony from any witness that indicates that Rondell acted in any manner that might indicate he got shot. He just took off and ran and scaled the fence. He didn't stumble. There's no evidence that he was bleeding. Now, this would be very different if there was something to show that there was a shot that hit Rondell at the gas station. If somebody said they saw him stumble or fall over, if his blood had been recovered, if there had been a .22 that had been recovered from the gas station. But we don't have any of this. All we have is … what we have, rather, is two shooting victims found in two different places, each one with some blood found right near where the victim's body is found, and no blood in between. It's very, very difficult to understand how that set of facts could happen unless there are two shootings in two different locations. Now, there were some outstanding questions from the court, if I could circle back and make sure that they get answered. As far as the trial judge's reliance on the testimony of Dexter Saffel, even if Dexter's testimony is found to be credible, and there are several pieces of objective evidence in this case that actually correctly contradict what Dexter says, but even crediting Dexter's testimony, because he doesn't say that he ever sees Rondell get shot, nobody says that they saw Rondell get shot at the gas station, and there's no other evidence of the shooting of Rondell at the gas station, all you have is Mr. Saffel identifying Darien as the shooter at the gas station. But the evidence shows and requires the inference that Rondell was actually shot at the Chase Bank,  doesn't actually prove what the state needs to prove in this case. There's also a question pertaining to whether there was any medical testimony regarding the capacities of somebody who had a bullet in his lung and a lung filling with blood and a severed pulmonary artery. There's a case that I think is quite instructive on this point. It's not cited in the briefs, but with the Court's permission, I would ask that we cite it as supplemental. Wait a second. What year is the case? It's 2015. It's Justice Hyman's decision in AZM. You have plenty of opportunity to have cited it prior to the argument. Okay. I don't think that would be fair. Either side, if they tried it, I'd use it. Okay. In any event, so the Court, however, does not have to check its common sense at the door. And we have the testimony from the medical examiner about the nature, the severity of Rondell's wounds. We know he had a bullet in his lung. We know his lung had filled with blood. We know major arterial connections between his heart and his lung had been severed. And yet he manages to scale a fence, run a full block, and we get two pools of blood next to two different victims and no evidence of any blood in between. In those circumstances, there's just not enough evidence to show that Darien actually shot Rondell at the gas station as opposed to the bank parking lot, and there's no evidence that Darien was ever in the bank parking lot. And so there's just simply not sufficient evidence to show that Darien, whatever happened at the gas station, there's evidence still does not show that it was Darien who shot and killed Rondell Moore. And so for that reason, his first-degree murder conviction must be reversed. If there are no more questions from the Court on that issue, I'd move on to issue number three pertaining to Darien's sentence. And the operative sentencing scheme in this case as applied to Darien violates both the Eighth Amendment and the Proportionate Penalties Clause of the Illinois Constitution. The trial judge's hands were tied in this case. The combination of two mandatory firearm enhancements, the consecutive sentencing statute and the truth in sentencing statute required the judge to impose the functional equivalent of life without parole. Actually, the judge could have imposed up to natural life, right? He had discretion. Could have imposed natural life, yes. The judge imposed the minimum penalties. Absolute minimum he could have imposed. And he wanted to impose less. Judge Ford said, I'm sorry that my options are limited in this case, but this was the lowest penalty that the judge could possibly impose. And he made quite clear on the record that he would have imposed a lesser sentence if he could, but the statute precluded him from doing so. And for that reason, Darien should have a new sentencing hearing at which the judge … Okay. So what can he do at a new sentencing hearing? Tell me. At a new sentencing hearing, the judge can consider the mitigating factors relating to Darien's youth and his potential for rehabilitation, and he can impose a sentence that the judge believes is more appropriate in these circumstances without regard to the statutory minimum penalties. But he has to disregard the law that specifies the minimum sentence. Well, where the minimum penalties violate a constitutional provision, then that's precisely what a judge has to do. For instance, in Peeble v. Leon Miller, and more recently in Peeble v. House, and in the Illinois Supreme Court … House was an accountability case, right? Excuse me? House was an accountability case. It was.  And so what about the subsequent case, Ibarra, where the court said House is distinguishable because House was an accountability case. Here, Ibarra was a shooter. In Ibarra, though, the trial judge, sentencing judge in that case, was asked to consider mitigating evidence relating to the defendant's youth and capacity for rehabilitation. The judge did that. The judge made very specific findings and said, even if natural life were not mandatory, I would still impose it because it's warranted by the notably ugly and egregious facts of Ibarra. So what record do we have here that would allow us to say that Mr. Harris, in particular, there are particular characteristics about him, other than his age, that warrant a lesser sentence? What record was made in the trial court? Well, ultimately, the question of what his sentence should be is for the trial judge to determine. The record that's been made to this point consists of, I mean, this initial matter, Darian. No, to this point, though. I mean, our Supreme Court, in a case asking the court to address this issue, said we're not going to address it because there is not an adequate record about how Miller would apply to this particular defendant. And I don't see any difference in this case in terms of the record that was created in the trial court. All we know is he was slightly over 18 years, and he had no criminal background. That's enough? Well, we also have letters that were submitted to the court for consideration at sentencing from various friends and relatives of people who knew Darian, describing Darian as, quote, a kid who looked for love in the wrong place and fell into the hands of the enemy as he sought to learn how to survive, how to fit in, how not to be bullied, how to be cool. This is exactly- But you're talking about when you look at Howes and you look at Ibarra and you look at the other cases, you see the courts considering the defendant's childhood, the circumstances under which the defendant grew up, his exposure to gangs or drugs. I look at this case. Mr. Harris grew up in a two-parent household. He described himself as spoiled by his parents. He had siblings. He was afforded an education. He had no prior criminal record. He had no involvement with drugs or alcohol. But what I would say, Your Honor, is that this court doesn't need to conclude that Darian should get a different sentence. The court needs to conclude at this point in order to remand for resentencing is simply that Darian is entitled to have the judge consider a fully developed record pertaining to his diminished culpability, heightened capacity for rehabilitation that come along with- But, Judge, I mean, the question is what factors would differentiate this case that are indirect from any other case where someone receives a sentence that would be basically a lifetime sentence, natural life? Well, we have the fact that Darian is barely 18. We have that he has no criminal record. We have the evidence and mitigation that was submitted to the trial judge that the judge couldn't really do anything with because he thought, my hands are tied, I have to- I guess my question is you keep referring to the evidence and mitigation. He's slightly over 18, and he has no criminal background. What other evidence and mitigation is there? There are those things. There's evidence pertaining to Darian's educational achievements while he's in custody, speaking to his capacity for rehabilitation. There's the letters to the court that I quoted just a moment ago. So that's the- And so could the argument you're making be made by a similarly situated 25-year-old? I don't think a 25-year-old is constitutionally equivalent to an 18-year-old. Why not? Well, we know that all of the research in neurobiology, developmental psychology, that Miller v. Alabama, the cases applying it, is based on. What they tell us is that the capacities for judgment, for self-control, for planning, for reining in impulsive behavior, all of those things that we know teenagers, people Darian's age, don't have, those capacities fully flourish by the time we turn about 25. So how about a 22-year-old, similarly situated 22-year-old? Can that defendant make the same argument? I'm just not fully developed. Well, I would say it depends on the circumstances of the particular case. I mean, this is such an extreme case because he's just barely past 18. And as another panel of the court said in-house, you can't assume that all of the things we know about teenagers and their propensity to do foolish and rash and impulsive things without thinking them through, that these things just go away. So how was this rash? The evidence shows he asked Erin for a ride to the BP station, got out of the car, and immediately started shooting. It sounds kind of premeditated to me. Well, what we know about Darian from the letters to the court is that he was seen by those who knew him as susceptible to various kinds of peer pressure, that he generally was a very kind and good kid, and something went wrong. I would suggest it's ultimately for the trial judge to determine whether, to what extent, all of those factors are at play in this case. I don't think the court needs to make that. This court needs to make that determination at this point. What Miller v. Alabama requires is just the discretion on the part of a sentencing judge to consider these factors as they pertain to a defendant's youth and determine whether they warrant the ultimate penalty of a de facto or de jure life sentence or whether they warrant something lesser. That's not a — in order to remain for resentencing in this case, this court doesn't need to come to the full conclusion that, yes, Darian needs to get a lesser sentence. I mean, the upshot would be that each of these cases would be ad hoc, that you have to look at the circumstances in every case. In some cases, there is a proportionate penalty problem, and in other cases there isn't. And so we really can't establish a body of law because they're all ad hoc. Well, there would be — admittedly, there would be a fair amount of discretion on behalf of sentencing judges, as there is in so many contexts. And what Miller v. Alabama tells us is that when you have a very youthful defendant who may well be susceptible to peer pressure, who may well lack adult capacities for judgment, planning, and appreciation of the consequences of one's actions, that a sentencing judge should have the discretion to consider the extent to which those factors pertain to the defendant's conduct in a particular case and to have the opportunity to make specific findings to bear out whether a sentence of life without parole is warranted or whether it's not in light of the evidence that's presented. Is that our decision, or should that be the legislator's — legislative decision-making? Well, the legislature certainly has broad authority to set penalty ranges, but to the extent that any of those penalty ranges run afoul of a constitutional guarantee, then they cannot be followed. That's what the Court in Leon Miller, for instance, specifically said, and that's the case even more so after Miller v. Alabama. As Justice Hyman just pointed out, you don't deny that he was sentenced within the statutory guidelines, correct? That's correct. He was sentenced to the minimum that the various sentencing statutes together required the sentencing judge to impose. So as Justice Hyman suggested, wouldn't this appeal be better made to the legislature? Well, in light of Miller v. Alabama and this Court's — another panel of this Court's opinion in House, pointing out that, you know, if you look at the underlying rationale of Miller v. Alabama, and what makes House persuasive authority is precisely the extent to which it doesn't just mechanically apply a precedent. It says, well, let's look carefully at what the underlying reasoning for this precedent is and determine how we need to apply this precedent in order to be faithful to that underlying reasoning to give it full effect. And the conclusion there was, well, it would be arbitrary and really, you know, senseless to conclude that at age 18, all of a sudden, everything changes and all the factors that go into Miller v. Alabama suddenly cease to apply. And so in light of those constitutional rulings, it's an argument that we think is appropriately made to this Court. As we said, we just asked the Court to allow Judge Ford to explain exactly what he meant when he said, I wish my — I wish I had more options in this case, and to give him a chance to say, here's the sentence that I would impose, here's the sentence that I believe is actually justified based on the facts of this case and the evidence about Darien that's presented to me. And so for that reason, we would ask for this Court to remand for him to consider these factors. If the Court has no further questions, I reserve my time for rebuttal. Take whatever time you think is necessary. Thank you. Justices, I'm Assistant State's Attorney Eric Liepled. I represent the people of the State of Illinois. First of all, as to the defendant's first issue, the defendant is inviting this Court to reweigh the evidence in this case, to substitute its judgment for that of Judge Ford.  I'm not going to argue with that. I'm not going to belabor this point, but this Court is well aware of the standard of review in sufficiency of evidence case, which is, in the light, most favorable to the State. As to the issues here, this defendant is asking this Court to speculate about a number of things. And one of those is this second shooter, which absolutely was argued in the motion for judgment of acquittal by his attorney, Donna Tunum, who argued this. She argued this. She was brought up. It was considered and rejected by Judge Ford. But we need to define our terms here because defendant's argument blurs the distinction between what is recovered on this crime scene and what is the evidence here. The crime scene, there's a total of six bullets that are on this crime scene. One is in Rondell Moore, and that was a .22 caliber bullet that was recovered during his autopsy. There's another one that is in Mr. Woollard that is near his backbone that is not recovered. Then there are four additional fired bullets, not fired cartridge cases. There's fired bullets. Two of these bullets are fired pursuant to the stipulation of Tracy Koerner, the ballistics expert. Two of those fired bullets were .38 caliber bullets that were fired from the same firearm. Then there's two additional bullets that are on this crime scene, one of them being a 9mm .38 that was inconclusive as to whether or not it was fired from the same firearm. And then finally, a .38 caliber bullet, again, inconclusive. All the bullets were found at the station? Justice, there was a stipulation. These were four additional. So there was two bullets from body, four on the crime scene. The crime scene? The gas station. The gas station? Yes, sir. My understanding was all four were found at the gas station? Yes. And those bullets and that evidence was presented pursuant to stipulation, the recovery of that by the forensic investigator, and also the testing and analysis of that by Ms. Koerner. How do you explain the fact there's no blood? At least there was no testimony as to any blood flowing from the gas station to the chase pick line. That also brings me to the second part that the defendant is asking us to speculate about. There's no textbook on how somebody behaves once they've been fired or once they've been shot. There's 500 cc's of blood that are recovered from the inside of Mr. Rondell Moore's body. There's 400 cc recovered from his pleural cavity, which is an area around his lungs, and then there's 100 cc blood in the peritoneal cavity. So, I mean, there's a fair amount of blood inside this man's body. And, you know, the location of these injuries on Mr. Rondell Moore's body with the injury to his lung, we don't know how he's, if he's not, I mean, we know that he's leaning out into his body. There's 500 cc's of blood, so I think that could be the explanation for it. But, again, we can't speculate because there's two people that were shot on this crime scene. We have Rondell Moore at the gas station. I'm sorry, Justice, but we have Rondell Moore who is shot at this gas station while the defendant walks up and ambushes him while he's working on his car. And then we also have Quincy Woolard. Quincy Woolard did not suffer fatal injury on that crime, at the gas station. He was dropped by those bullets. We have two people standing right next to each other that are shot behaving completely differently after being shot. There's no textbook. This court has handled several murder cases, and people die in many different ways, and especially as far as how it goes with firearms, we don't know. People don't know until we just die. It's not like a movie situation where people, you know, it's lights out. So as far as what the credible testimony in this case shows, as you pointed out, Justice Neville, is that Judge Ford found Dexter Saffold's testimony to be conclusive here. He's 18 feet away. I said the most credible. Okay. I'm sorry. That did not mean to misquote you, Justice. But the most credible. But I have a follow-up question. Yes, sir. Did Dexter Saffold testify that he saw Mr. Harris shoot Wando? He testified that he saw him shoot, firing a weapon at the gas station park. He did. He testified, and this is on pages 8A64 of the record through 8A66, and in this situation, we have Mr. Saffold saying, I'd say 8A63, I'm sorry, Justice, where it's when you saw the defendant shooting that gun, how far were you away from him in relation to where I'm standing? Were you closer or farther away? I was a little bit closer. And then there's also some further testimony regarding seeing muzzle flashes and also seeing that he just saw one person with the gun, which is our defendant in this case. So there is testimony in the record regarding that from Dexter Saffold. But then you don't deny that there are two calibers of bullets that are found. And just one gun is seen. You're saying because we must consider the evidence in light most favorable to the prosecution, we should ignore that evidence? I'm not asking the court to ignore that. Unfortunately, Your Honor, in many neighborhoods and city of Chicago, there are evidence of other shootings on crime scenes. And who knows if these bullets were connected to this shooting. We know that there was a .22 caliber bullet recovered from Ron Delmore's body. That is the only conclusive evidence that we have in this whole case as to any caliber bullet that was doing any shooting. We could say that these bullets were recovered on our gas station. But we have the bullet in, with regard to Mr. Wolford. We don't know what caliber that is, Your Honor. In his body, we don't. Yes, sir. We don't know what caliber. We don't know what size. There's no testimony that, I'm not even certain that you could tell a caliber of a bullet in an MRI or anything like that. But there is a bullet there. But the .38 caliber, if we're going to go down that path, Your Honor, there's a possibility that there's the two bullets that match each other. Then a third, which is a .38 caliber. Then a fourth, which is a .38 9mm. It's inconclusive. They all have the same direction of twist and the same lanes and grooves, but this is not a situation where we can conclusively say there's a .38 caliber here and a .22 caliber here. We can't. And that evidence was before the court. And considering that evidence in the lightmost area of real estate,  And we're not asking, and nor was the evidence only presented at trial, that it was just Dexter Saffold. It was also Ronald Moore, who testified to what he saw when his brother was shot and when Quincy Willard was shot, when the defendant pointed the gun directly at him, tried to fire the gun, and it wouldn't. And then we also have Quincy Willard, who corroborates what happens there. He doesn't see what shoots, who shot him, but he corroborates. And Aaron Jones, who brought the defendant to the crime scene, Judge Ford had every right to be a suspect of this man, but he could still, based upon his grand jury testimony and also his ERI recorded videos, put whatever weight he wanted on that according to 11510.1. And that was the function of the court there. We also have the video from the gas station. So there is a lot of evidence. It doesn't really tell us too much. It doesn't tell us, but it corroborates. Again, we're all corroborating. People running and... Certainly. Yeah. But Dexter Saffold, if we're going to go back to Dexter Saffold and then Judge Ford's credibility finding based upon him, all of this evidence shows that we can trust and believe his testimony as the court was right to find him guilty, the defendant guilty, based upon that testimony. If there are no further questions about Issue 1, I would like to move on to Issue 2, or actually the Argument 2, which is Argument 3 in their brief. The 18-year-old defendant here was sentenced to a 76-year term of imprisonment. He now claims that his sentence is unconstitutional because he was sentenced to a de facto natural life sentence. He's a youthful offender, not a juvenile. The sentencing statute is unconstitutional as applied to him, preventing the trial court from considering his youth in mitigating circumstances. Does the state disagree with the result in House? I do. We actually, I believe that House is wrongly decided based upon two things. And if I could come back to answer your question. The defendant is actually advancing a two-part argument here, which is blurring the distinction, the important distinctions between Eighth Amendment jurisprudence on one hand and an Illinois proportionate penalty jurisprudence on the other. As far as the Eighth Amendment goes, advancing that, that's been decided by the Graham, Roper, Miller, Montgomery, and also in our Supreme Court in Reyes, which talks about Davis, which is the case that the defendant wanted to cite as additional authority. Those are Eighth Amendment cases. That's been decided under the Eighth Amendment. It's 18 years old. Roper said that. It's what it is. We're done talking about that. But now as far as proportionality and as far as that penalty goes, now we're going back to Antonio House. And because they're asking us to say whether or not the Illinois proportionate penalty part of the Constitution provides more protection than the Eighth Amendment. And what we have here is Antonio House is relying on that area of the law, but it's controlled by two important Illinois Supreme Court cases, which are People v. Taylor and also People v. Leon Miller, which construe the proportionality penalty clause of our Constitution. Taylor is a 1984 case, and I recognize the fact that it is an old case, but it recognizes and covers this territory where we had a juvenile offender in that case and an adult offender where a murder occurred where two people were killed when there was a recovery of jewelry. And in that case, the court held that the mandatory life statute was proper as a constitutional, as applied to both defendants in this case, based upon the proportionality penalties challenge that was made there. And the defense was arguing there that because we have the rehabilitative part of our proportionality penalty clause under our Constitution, Article I, Section 11, but that doesn't prevent the legislature from fixing mandatory minimum penalties where it has been determined that no set of mitigated circumstances allow a proper penalty. And that controls there. Same thing, Leon Miller, even though we have the important confluence of the three different statutes of juvenile auto transfer, of accountability, and then mandatory natural life for multiple body homicides, there, even in that case, they said under the right circumstances, a mandatory natural life sentence for a juvenile could still be constitutional, even an accountable one. That is an early 2000s case, and obviously the landscape has changed quite a bit since then. But they were still going there. But the good precedent that we have to follow here are set by those two cases. And really what the defendant is asking this court to do is overrule a Supreme Court opinion, which this court cannot do. This man was 18 years old, two months, when he committed this crime. He is an adult. All the other jurisprudence in this area, whether it be Romar, Gibson, or Reyes, we're dealing with juvenile offenders. This man is an adult. Youthful offender. So you think it's a bright-line rule? You agree with House, which you already said, and House obviously is saying it's not a bright line. It is not a bright-line rule. Excuse me. Thank you. You got it. No, it is a bright-line rule. House, based upon the precedent I just cited of Taylor and then Leon Miller, it is. And until our Supreme Court decides differently, our legislature decides differently, it is a bright-line rule. And we are bound to follow it. What about the United States Supreme Court cases? They don't seem to agree with our Supreme Court in terms of this bright-line rule. They're willing to consider the fact that somebody's young and impulsive, makes bad decisions. You don't think that they should consider what the U.S. Supreme Court says? Or do you think they're in lockstep with our Supreme Court? Our laws, our Illinois Constitution provides greater protection for people in this situation. The United States Supreme Court is construing Eighth Amendment jurisprudence. And yet, under those precedents, I agree, under the Eighth Amendment, we absolutely, you know, 18 is the rule. I mean, Roper, Miller, Graham, Montgomery, they all considered juveniles who were under the age of 18 at the time they committed their offenses. And they still consider all the brain science studies, all the law review articles, all the psychological aspects of studies, they considered all those. And they still left in place that 18-year-old demarcation line between youth and adulthood. Under our laws, and where Antonio House and Justice McBride, in that opinion, she is, in that opinion, is arguing that our jurisprudence, because of the fact that we have more here, in Article I, Section 11, requires that penalties must be determined according to the seriousness of the offense. And also penalties must be determined with the objective of restoring the offender to youthful citizenship. I mean, there's no correlation, or there's no similar aspect to the Eighth Amendment as that second part that we added in our 1970 Constitution in Illinois. And that's where Justice McBride is finding that in her, in the opinion of Antonio House, that it is not a right-line rule. So if we accept, if we accept House, you lose. If we reject House, you win. I do not, no. Our defendant here is a principal. Antonio House was, he was more accountable than Leon Miller was. He participated in the kidnapping of the victim. He also brought the victim to his, where he was ultimately executed. He was also armed, if I'm remembering correctly. So, I mean, there's more than Leon Miller. And, but he's still accountable. So Justice McBride, in that opinion, is looking at the confluence of the multiple bodies and then the accountability statute, dropping out the juvenile auto transfer there. Here, as Justice Mason mentioned Martin Ibarra earlier, we have a principal. He's the sole shooter on this crime scene at the gas station. So it is not under the protections of House, even if there's a right-line rule or not a right-line rule at 18. Antonio House is really focused on an accountable defendant. We don't have that. We don't have a juvenile defendant. We have a man that committed a heinous crime. He ambushed two people while they were working on a car, murdering one, leaving another one with a bullet in his back for the rest of his life. Nerve damage to his feet and back pain. If there are no further questions on Issue 3, for those reasons and those stated in our brief, I'd ask that you affirm the defense conviction and sentence. Thank you. Mr. Berger, your opponent says we're going to be overruling our Supreme Court if we accept your argument. Tell me why he's wrong. Well, that's not true because for several reasons. One, so in People v. Taylor, the case that the State is ordering you would possibly have to be overruled, you know, purporting to overrule in this case. In Taylor, the issue that was raised there was not a proportionate penalties challenge or an Eighth Amendment challenge, but it was a separation of powers argument, which is not the argument that we are raising in this case. I think, as the State mentioned, the Leon Miller opinion addressed Taylor, and it said, Yes, we recognize, of course, the legislature has the authority to set the statutory penalty ranges, but where those penalty ranges are found by the judiciary to fall foul of a constitutional protection, then the judiciary has the ultimate say as to whether those penalties are valid. It's also important to note, I mean, in one sense, Taylor is not good law anymore because there was a juvenile defendant in that case who was 16 years old, and Taylor upheld his mandatory life sentence, and we know that's not good law anymore because that directly violates Miller v. Alabama. And it's important to keep in mind that recently in the Illinois Supreme Court's decision in People v. Thompson where the defendant raised a as-applied challenge to a mandatory life sentence, the Court said that it couldn't be raised at that point because it was on appeal from the denial of a Section 214.1 petition that was 17 years late, relied on the void judgment rule, which Castleberry abolished, and so on. The Court said, though, defendant can find recourse by presenting this argument in a post-conviction petition. Now, the State cited Taylor in Thompson. The defendant in Thompson was 19. If Miller v. Alabama was a categorical, no-questions-asked, bright-line rule, and if Taylor was absolutely the controlling precedent here, it makes little sense for our Supreme Court to not say, look, the defendant was 19. He can't make this argument. But the Illinois Supreme Court said, just make it in a PC, filed now, because you can't do it on appeal from the denial of your petition for relief from judgment. Illinois Supreme Court could have very easily accepted the argument that the State is making here and foreclosed Thompson's claim, and it chose not to. So for those reasons, I don't think that this Court needs to overrule any Supreme Court precedent to define that the reasoning of House was persuasive authority and to apply it in this case. I'd like to go back for a moment, if I can, to the first argument, the sufficiency of the evidence for Darian's conviction. And the point that I would like to stress, closing for the Court, that the review of the evidence here that we're asking this Court to undertake is not to revisit the trial court's credibility assessments. It's to ask what reasonable inferences can be drawn from the evidence that we have. And that's a different question. That's sufficiency of the evidence review. And for the reasons that we've put forward, regardless of credibility assessments that the trial court made about Dexter Saffold or Ronald Moore, these individuals did not testify that they saw Rondell Moore actually get shot. They did testify that they saw Darian Harris discharge a firearm. We know Quincy Woodard was shot and injured in that series of events. But there's – but there – according to you, there is no reasonable inference that can be drawn from the uncontested testimony that Mr. Harris fired in the direction of the two people standing by the disabled car. And no reasonable finder of fact could find that he intended to shoot and did shoot Rondell Moore. Well, no reasonable finder of fact could find that he did shoot Rondell Moore at the gas station because there's nobody – No inference. No reasonable inference can support that conclusion. I don't believe that there is because there's nobody who sees Rondell acting in any way that suggests he gets shot. There's no evidence that Rondell's blood is at the gas station or that Rondell's blood is on the fence or in the alley or anywhere until the bank. There's no evidence that Darian had a second gun, and we know that the bullet recovered from Rondell was not consistent with the bullets that were recovered from the gas station. We have to conclude that an individual with, as the State pointed out, a significant amount of blood in his lung and a severed arterial connection between his heart and his lung managed, unlike Quincy Bullard, who fell to the ground immediately when he was shot, this individual, Rondell, managed to run away and scale that fence and run all the way down the block and make it to the bank where the forensic investigators found some blood in the bank parking lot but nothing in between. That's an extraordinary set of circumstances. Did any witness testify that they heard any other shots other than those fired in the BP parking lot? No, but nobody was ever asked about any events that happened subsequent to what they witnessed at the gas station. And that's what we don't know. We know that it's an incredible situation if Rondell had actually been shot at the gas station and made it to the bank under these circumstances. So we know there was a second shooting. We know that there was a second gun. We don't have any evidence at all that ties Darian Harris to the shooting of Rondell Moore. And for that reason, we would ask the court to reverse his first-degree murder conviction and for the reasons presented in the brief, his attempt murder conviction, or alternatively, to give Judge Ford the opportunity to explain exactly what he would have done if he had had the discretion to consider mitigating evidence pertaining to Darian too. Thank you. I thank both sides for presenting us with a lot to think about. And we'll take case under advisement. Thank you very much.